**RESOLUTION TRUST CORPORATION, as Receiver for Empire Federal Savings Bank of America, Plaintiff,**

**v.**

**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Defendant.**

**No. 93-CV-632C.**

United States District Court, W.D. New York.

March 26, 2001.

Hopkins & Sutter (David G. Goroff, of Counsel), Chicago, Illinois, for Plaintiff.

Jaeckle Fleischmann & Mugel, LLP (Anthony J. Latona, and Mary C. Fitzgerald, of Counsel), Buffalo, New York, for Defendant.

*INTRODUCTION*

CURTIN, Senior District Judge.

On August 11, 2000, defendant Massachusetts Mutual Life Insurance Company ("MassMutual") filed a Motion to Compel pursuant to Fed.R.Civ.P. 37. By its motion, MassMutual sought production of documents and information from plaintiff Federal Deposit Insurance Corporation ("FDIC")[1] generally concerning advice provided to and internal decision making processes of FDIC's predecessor-in-interest, Resolution Trust Corporation ("RTC"), regarding the interpretation of the Empire of America Federal Savings Bank Employee Retirement Plan (the "Plan") and how to address the funding issues of the Plan. *See* Item 85, ¶ 2. In support of the motion, MassMutual filed a Memorandum of Law. Item 86.

On September 11, 2000, FDIC cross-moved, pursuant to Fed.R.Civ.P. 37, seeking an order compelling (1) MassMutual to make its expert disclosures, if any; (2) production of documents related to MassMutual's "post-Amendment activity, its computer error, and its affirmative defenses;" (3) a Rule 30(b)(6) deposition on the issue of MassMutual's affirmative defenses; and (4) payment of attorney's fees. Item 87. FDIC submitted an Affidavit in Opposition to MassMutual's Motion to Compel and in Support of Motion to Compel by Plaintiff (Item 89) and a Memorandum in Opposition to MassMutual's Motion to Compel. Item 88.

MassMutual submitted an Affidavit (Item 91) and Memorandum of Law (Item 92) in Further Support of its Motion to Compel and in Opposition to Plaintiff's Cross–Motion. FDIC filed a Reply Memorandum and Affidavit in Support of its Cross–Motion to Compel (Items 93 and 94), and MassMutual answered with a Sur–Reply Memorandum. Item 96.

On January 24, 2001, this court heard oral argument on the cross-motions to compel. Following argument, FDIC submitted affidavits from Robert Scharbach (Item 99) and Frederic Singerman, Esq. (Item 98), concerning to whom the Singerman Memorandum may have been shown. Having considered the parties' arguments, the court denies MassMutual's Motion to Compel production of the Singerman Memorandum, delays decision on its motion to compel answers to Interrogatory 23 and provide related documents, and delays decision on certain parts and denies certain parts of FDIC's Cross–Motion to Compel.

1. FDIC is receiver for Empire Federal Savings Bank of America and is successor in interest to Resolution Trust Company ("RTC"). FDIC and RTC will be used interchangeably throughout this order.

*BACKGROUND*

In September 1990, Resolution Trust Company (RTC) was appointed receiver for Empire Federal Savings Bank of America ("Empire"), a failed bank. As receiver, RTC was to wind up the business of Empire's Pension Plan. Following RTC's appointment, the FDIC became RTC's statutory successor-in-interest. Item 80, p. 1. By way of this action, FDIC argues that MassMutual, as the Plan's actuary, committed professional malpractice when it erroneously advised Empire to approve a certain amendment to the Plan (the "1990 Amendment"). Item 67, ¶¶ 3–5. Although the FDIC recognizes that the Plan was underfunded by several million dollars, it insists that the Plan's overall underfunding is not relevant in this case. *Id.* ¶¶ 6–7. The FDIC asserts that MassMutual's malpractice, which caused the Plan to be underfunded by an amount in excess of $4 million, is at issue. Item 73, p. 3.

In response, MassMutual maintains that FDIC's own conduct caused the Plan to become underfunded. Item 70, pp. 3–4. MassMutual disputes FDIC's measure of damages, charging that the costs of adopting the 1990 Amendment were not fixed. Item 81, ¶¶ 9–10. In support of that assertion, MassMutual points to documents it received during discovery which reveal that FDIC considered and rejected alternative methods of winding up the Plan, which would have reduced the amount of underfunding. *Id.* ¶ 10. Therefore, MassMutual concludes, it was FDIC's own negligence and failure to mitigate damages that caused the Plan's underfunding.

Suffice it to say that the discovery process has been protracted and contentious, and has resulted in numerous Decisions and Orders from this court over the case's seven-year history. FDIC has consistently objected to numerous discovery requests, citing work-product and attorney-client privilege, as well as lack of relevancy, as reasons for not producing certain requested documents and information. In an order filed November 9, 1999 (Item 80), the court addressed MassMutual's previous Motion to Compel (Item 62) and provided guidance to the parties concerning FDIC's Responses to MassMutual's Interrogatories. In response to the order, FDIC submitted Amended Responses and Objections to Defendant's Second Set of Interrogatories, dated March 28, 2000. Now MassMutual makes another Motion to Compel, seeking documents that it had previously requested in its First Set of Interrogatories and Notice to Produce, dated February 13, 1995, and Second Notice to Produce, dated October 11, 1996, as well as a full response to Interrogatory 23 contained in MassMutual's Second Set of Interrogatories, dated October 11, 1996.

Specifically, MassMutual is requesting:

(1) a full copy of the August 30, 1991 memorandum prepared by Frederic Singerman, Esq., attorney for Hopkins & Sutter (the "Singerman Memorandum"). This 55-page document outlined six options available to RTC to terminate the Plan, including an analysis of the legal ramifications regarding the options, once MassMutual had informed RTC of the funding shortfall;

(2) any other documents providing advice to the RTC regarding interpretation of the Plan and how to address the Plan's funding status; and

(3) documents and information relating to RTC's decision-making in 1991 and 1992 concerning interpretation of the Plan and how to address Plan funding. Item 85, ¶ 2.

*DISCUSSION*

**I. MassMutual's Motion to Compel**

**A. The Singerman Memorandum**

The greater part of MassMutual's argument in its August 11, 2000 Motion to Compel is devoted to its hitherto unsuccessful attempt to gain access to the Singerman Memorandum. MassMutual contends that the advice provided by Hopkins & Sutter via that Memorandum, authored by Hopkins & Sutter attorney Frederic Singerman, "impacted directly on the RTC's claim against MassMutual and its alleged damages." Item 86, p. 10. Through discovery, MassMutual did gain access to an August 30, 1991 cover letter (the "cover letter") written by Mr. Singerman to two RTC attorneys, which appeared to accompany the Singerman Memo-

randum. The cover letter referred to six different alternatives Hopkins & Sutter had proffered for RTC's consideration which addressed the funding status of the Plan, and briefly described three of the options. Item 85, Exh. E. In the cover letter, Mr. Singerman referred to Alternative Four as the "most expensive alternative" for RTC to fund the pension plan; Alternative Two which would "revise the method of calculating lump sum distributions so as to eliminate the plan's underfunding"; and Alternative Six which would eliminate retroactive vesting and thus reduce the plan's alleged underfunding. *Id.* Mr. Singerman explained that if RTC chose Alternative Two, "it would most likely not be possible to sue Massachusetts Mutual Life Insurance Company ('Mass Mutual') for malpractice." *Id.* The letter urged RTC to make a business decision quickly concerning which alternative RTC wished to pursue, since delay would add cost to the Plan due to falling interest rates.

Based on the information culled from the cover letter, MassMutual argues that the Singerman Memorandum enjoys no protection from disclosure because of the work-product privilege. It argues that it was not material prepared in anticipation of litigation and it has "substantial need" for the information. Mass Mutual claims that any privilege that may have attached to the Memorandum has been waived (a) through voluntary disclosure to a third party; and/or (b) by FDIC's placing the information contained in the Memorandum "at issue."

FDIC counters that (1) the law of the case prevents MassMutual from again trying to invade FDIC's privileges; (2) the Singerman Memorandum is protected by both the Attorney–Client and (3) Work–Product privileges; (4) no waiver was effected either by the "at issue" doctrine or voluntary disclosure; and (5) the information requested is irrelevant.

As guideposts providing direction in the privilege thicket, it is helpful to remember that

> The work product doctrine is intended to protect against invasion and exploitation of work product by an adversary, and is therefore waived only when disclosed to an adversary; the attorney-client privilege is premised upon an interest in confidentiality as to all persons outside the attorney-client sphere, and is therefore waived when disclosed to any third party.

*Tribune Co. v. Purcigliotti,* 1997 WL 10924 at *6 (S.D.N.Y.1997).

**1. Law of the Case**

FDIC asserts that when MassMutual first moved to compel production of the Singerman Memorandum in 1995, the court, in its June 6, 1995 Order (Item 44) refused to order FDIC to produce the Memorandum. *See* Item 89, ¶ 15. In addition, by the Order dated November 10, 1999 (Item 80), FDIC asserts the court has refused to invade FDIC's privileges. Thus, FDIC concludes that "these prior rulings by the Court are the law of the case, and MassMutual should not be allowed to litigate the issue of FDIC's privileges for a third time." Item 88, p. 6.

MassMutual points out that the court has never ruled on whether the Singerman Memorandum should be disclosed. The June 6, 1995 order "briefly referenced the parties' motions to compel, which included MassMutual's request for a copy of the Singerman Memorandum. The Court, however, did not rule on whether or not the discovery motions should be granted.... There was no ruling that denied discovery of the Singerman Memorandum." Item 92, p. 14. Further, MassMutual notes that the November 9, 1999 Order compelled FDIC to more fully respond to certain interrogatories, but did not address the motion to compel production of documents, including the Singerman Memorandum.

In reviewing both Orders, the court holds that it has never specifically addressed the production of the Singerman Memorandum. Since there are no prior rulings on the issue, any alleged "refusal" to compel FDIC to produce the Memorandum is not the law of the case, and plaintiff's argument is unavailing.

**2. The Attorney–Client Privilege**

The attorney-client privilege is the "oldest of the privileges for confidential communications known to the common law."

*Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1980). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* The privilege must be claimed by the client and can be waived only by the client, not by counsel. *Carte Blanche (Singapore) PTE, Ltd. v. Diners Club Intl. Inc.,* 130 F.R.D. 28, 31 (S.D.N.Y. 1990).

The attorney-client privilege attaches: "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor (8) except the protection be waived." *Occidental Chemical Corp. v. OHM Remediation Services Corp.,* 175 F.R.D. 431, 436 (W.D.N.Y.1997) (citation omitted). The privilege also covers communications from the attorney to the client which include legal advice. *Fine v. Facet Aerospace Products Co.,* 133 F.R.D. 439, 444 (S.D.N.Y.1990).

MassMutual does not dispute that the Singerman Memorandum would be covered by the attorney-client privilege, as it admits "[w]hile plaintiff previously denied the relevance of the Singerman memorandum, it is now indisputable that Hopkins & Sutter was providing legal advice as a central part of the RTC's decision-making process during Plan termination and distribution." Item 85, ¶ 11. Rather, MassMutual asserts that the privilege was waived by disclosure and the at-issue doctrine, both of which are discussed below in Sections 4 and 5.

### 3. Work–Product Privilege

The work-product privilege, or doctrine, has been codified in Fed.R.Civ.P. 26(b)(3).[2] Its purpose is to "preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation' free from unnecessary intrusion by his adversaries." *United States v. Adlman,* 134 F.3d 1194, 1196 (2d Cir.1998) (citation omitted). It is viewed as promoting the adversary system since it allows attorneys to be free to prepare their cases without fear that their work product will be used against their clients. *Cooper Hospital/Univ. Med. Ctr. v. Sullivan,* 183 F.R.D. 119, 128 (D.N.J.1998) (citing *Hickman v. Taylor,* 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947)). To invoke the protection of the rule, the party resisting discovery bears the burden of establishing that the documents in question were "prepared principally or exclusively to assist in anticipated or ongoing litigation." *United States v. Construction Prods. Research, Inc.,* 73 F.3d 464, 473 (2d Cir.1996). That party must "demonstrat[e] both that the privilege exists and that it has not been waived." *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.,* 184 F.R.D. 49, 50 (S.D.N.Y.1999) (citations omitted). Even if the document comes within the scope of the rule, "the protection afforded is conditional and 'may be set aside if the discovering party demonstrates a sufficiently pressing need for the data.' " *In re Kidder Peabody Securities Litigation,* 168 F.R.D. 459, 462 (S.D.N.Y. 1996) (citation omitted). However, documents that "tend[ ] to reveal the attorney's mental processes" receive special protection not accorded to factual material. *Adlman,* 134 F.3d at 1197, citing *Upjohn v. United States,* 449 U.S. 383, 399, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Unlike the attorney-client privilege, "the work-product privilege is not necessarily waived by disclosure to any third party; rather, 'the courts generally find a waiver of the work product privilege only if the disclosure substantially increases the op-

2. "[A] party may obtain discovery of documents and tangible things otherwise discoverable... and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means... In ordering discovery of such materials... the court shall protect against disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation."

portunity for potential adversaries to obtain the information.' " *Falise v. American Tobacco Co.,* 193 F.R.D. 73, 79 (E.D.N.Y.2000) (citations omitted).

### a. Anticipation of Litigation

MassMutual claims that the description of the Singerman Memorandum contained in the August 30, 1991 cover letter demonstrates that the Memorandum was not prepared in anticipation of litigation and thus enjoys no protection from disclosure. MassMutual argues that the Memorandum was prepared in the regular course of business, while RTC was "still considering its options regarding the action to take *in the context of Plan termination and distribution* " which did not occur until 1992. Item 85, ¶ 21. At that time, MassMutual alleges, Singerman was advising the RTC about what business decision it should make. MassMutual argues that Hopkins & Sutter's input reflected advice on how to interpret the Plan and distribute its assets, and "[t]he fact that [their] legal advice formed the basis for that business decision does not convert it into privileged work product." Item 92, p. 19. In addition, the litigation was not commenced until July 1993, "further highlighting the fact that the Singerman memorandum was prepared for business purposes, not for litigation." Item 86, p. 19.

Contrarily, FDIC avers that the Singerman Memorandum "contains the mental impressions of an attorney, as the entire memorandum is a recitation of attorney analysis and advice" and that "large parts ... were prepared in anticipation of litigation between the FDIC and MassMutual and between the FDIC and other parties ... evidenced by the extensive discussion of litigation, and analysis of potential litigation between the FDIC and other parties." Item 88, p. 8. Further, FDIC asserts that the fact that litigation had not commenced in August 1991 did not destroy the privilege.

At oral argument, David Goroff, counsel for FDIC, stated that in Spring 1991, FDIC was thinking of suing MassMutual once it had learned in May 1991 that MassMutual used the wrong interest rate in calculating the cost of the Plan's amendment.

*Adlman* provides the latest and clearest articulation of the Second Circuit's position on the interpretation of the phrase "anticipation of litigation." *Adlman* is also instructive on the sometimes ambiguous issue concerning documents "which, although prepared because of expected litigation, are intended to inform a business decision influenced by the prospects of the litigation," which provides parallels to the case at bar. *Id.* at 1197–98.

*Adlman* provided a background discussion on how different circuit courts have interpreted the phrase, "in anticipation of litigation:" some circuits view the phrase as encompassing documents prepared " 'primarily or exclusively to assist in litigation'—a formulation that would potentially exclude documents containing analysis of expected litigation, if their primary, ultimate, or exclusive purpose is to assist in making the business decision." *Id.* at 1198. Other circuits "ask whether the documents were prepared 'because of' existing or expected litigation—a formulation that would include such documents, despite the fact that their purpose is not to 'assist in' litigation." *Id.* The court examined the reasoning behind both interpretations and chose the latter as the law in the Second Circuit:

> Where the Rule [26(b)(3) ] has explicitly established a special level of protection against disclosure for documents revealing an attorney's (or other representative's) opinions and legal theories concerning litigation, it would oddly undermine its purposes if such documents were excluded from protection merely because they were prepared to assist in the making of a business decision expected to result in the litigation.

*Id.* at 1199. Aligning itself with the Wright & Miller treatise, and the Third, Fourth, Seventh, Eighth, and D.C. Circuits, the Second Circuit agreed that "if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation,' " it is eligible for protection by the work-product privilege. *Id.* at 1202 (citations omitted).

*Adlman* then discusses the next step in determining whether the privilege applies: would the document have been prepared *because of* the expected litigation or would it have been prepared *irrespective of* the expected litigation? *Id.* at 1204. As summed up in *Granite Partners,* "[i]t may well be said that the effect of *Adlman* is to enforce the work product privilege even if there is a dual purpose for the creation of the materials." 184 F.R.D. at 54.

According to the Affidavit of Stewart Sheppard, Esq., a partner at Hopkins & Sutter (Item 89, Exh. A), the Singerman Memorandum was prepared three months after FDIC learned from MassMutual that the Plan's liabilities "were much greater than those reflected in the calculations MassMutual had previously supplied to the RTC in September, 1990 in connection with ... the Amendment." *Id.* ¶ 9. Mr. Sheppard confirmed that Hopkins & Sutter provided "legal advice to the RTC with respect to the consequences of this newly-discovered information on the Plan's increased liabilities. Among Hopkins & Sutter's responsibilities was the task of helping to assess the RTC's legal options for solving the problems resulting from the Plan's underfunding problem." *Id.* ¶ 12. The Memorandum outlined those legal options. *Id.*

Having reviewed the Memorandum *in camera,* the court agrees with FDIC that the document can fairly be read as being prepared because of the prospect of litigation. The Memorandum outlines legal consequences that would likely arise as a result of choosing from various options available to address the Plan's underfunding, a majority of which include the prospect of litigation. Given the guidance provided by *Adlman* regarding how to address such closely intertwined business and legal issues, the court finds the Singerman Memorandum is protected by the work-product privilege.

**b. Substantial need**

Rule 26(b)(3) permits discovery of work-product materials where the party seeking such discovery "has *substantial need* of the materials in the preparation of the party's case" and is "unable without undue hardship to obtain the substantial equivalent of the materials by other means." However, this standard applies only to *"ordinary"* work-product materials. The next sentence of Rule 26(b)(3) (*see* footnote 2, *infra*) provides that discovery of the "mental impressions, conclusions, opinions, or legal theories of an attorney," denominated "core" or "opinion" work product, is accorded a higher standard of protection according to interpretations by the Supreme Court and Second Circuit. *See Magee v. The Paul Revere Life Ins. Co.,* 172 F.R.D. 627, 643 (E.D.N.Y.1997) for cases so holding.

MassMutual has recounted that it has not been able to access the information contained in the Memorandum from other sources, since witnesses who were deposed could not recall the information or because the FDIC refused to allow witnesses to respond to questioning on the topic by claiming privilege. MassMutual stresses the information is critical because the legal advice provided by Hopkins & Sutter "formed a crucial part of the RTC's decision-making that ultimately resulted in [the] alleged claim against MassMutual.... Full discovery ... is necessary to understand ... the reasons for such decisions, and the options available that might have otherwise mitigated the RTC's alleged damages." Item 86, pp. 12–13. MassMutual is particularly interested in the Memorandum because one of the options, as conveyed in the cover letter, would eliminate the Plan's underfunding; however, if that option was chosen, Singerman wrote that *"it would most likely not be possible to sue Massachusetts Mutual Life Insurance Company ... for malpractice."* *Id.* p. 16.

Again, the parallels between *Adlman* and this case are instructive. The Singerman Memorandum, just like the memorandum at issue in *Adlman,* "falls within the most protected category of work product—that which shows the mental impressions, conclusions, opinions or legal theories of an attorney or other representative." *Id.* at 1204. *Adlman* found that Rule 26(b)(3) "is clear that, at a minimum, such material is to be protected unless a highly persuasive showing is made." *Id.* The standard for production in this type of case is "more stringent" because material

reflecting thought processes or strategy of an attorney deserves the highest protection. *Tribune Co. v. Purcigliotti,* 1997 WL 10924 at *4 (S.D.N.Y.1997). The Singerman Memorandum consists of legal analysis of possible business options available to RTC as it confronted the Plan's underfunding. RTC representatives have been deposed, although MassMutual claims that they could not recall the information it was seeking. MassMutual has gained access to the cover letter which provides them with a description, albeit not detailed, of one of the options RTC considered that would appear to mitigate damages. However, the court finds that MassMutual has not made the kind of highly persuasive showing required by Rule 26(b)(3) so as to pierce the "most protected" category of work-product privilege, and declines to order FDIC to make the Memorandum discoverable under exceptions to the work-product privilege.

**4. Waiver Under the "At Issue" Doctrine**

*Granite Partners* has instructed, "Just as the party seeking to assert a claim of privilege bears the burden of establishing the existence of the privilege, that same party has the burden of establishing nonwaiver." 184 F.R.D. at 54. Courts have found waiver to exist in a number of circumstances, and the "at issue" waiver is prominent among them.

The Second Circuit has adopted the "at issue" waiver doctrine first enunciated in *Hearn v. Rhay,* 68 F.R.D. 574, 581 (E.D.Wash.1975). In that case, a prisoner brought a civil rights suit against prison officials, who claimed immunity under the good faith immunity defense. The court found that the defendants had implicitly waived the attorney-client privilege regarding issues of malice toward plaintiff or knowledge of his constitutional rights. In so deciding, the court explored how an implied waiver could be established through the following factors:

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

*Id.* at 581.

The Second Circuit cited *Hearn* with approval in *United States v. Bilzerian,* 926 F.2d 1285 (2d Cir.1991). The "at issue" waiver has been described as occurring "when the privilege holder makes assertions in a litigation context that put its otherwise privileged communications in issue ...." *Liberty Environmental Systems Inc. v. County of Westchester,* 1997 WL 471053 at *3 (S.D.N.Y. 1997) (citing *In re von Bulow,* 828 F.2d 94, 102–03 (2d Cir.1987)). Often waivers of the attorney-client privilege have been found when a defendant asserted an advice-of-counsel defense. *Liberty, Id.*

**a. A *Hearn* Analysis of the 'At Issue' Factors**

MassMutual asserts that the Singerman Memorandum, being relevant to the claims and defenses in the action, has been placed "at issue." Item 86, p. 14. Further, it describes how the FDIC's affirmative act of suing MassMutual for $4.5 million in damages placed the Singerman Memorandum "at issue" because it "could provide support for MassMutual's argument that it is not responsible for the underfunding that the FDIC seeks to charge it with or that underfunding could have been avoided." Item 92, p. 21. MassMutual cited *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465 (S.D.N.Y.1993), for its holding that because plaintiffs might be unfairly deprived of potentially crucial evidence directly impacting on defendant's proposed allocation of blame, the otherwise privileged information was put in issue and the privilege was deemed waived.

FDIC challenges MassMutual's assertion that the "at-issue" waiver applies. Although still arguing post-Amendment relevancy, FDIC points out that the "at-issue" exception "cannot be triggered by the pleadings of the party *seeking* discovery of privileged information, or the opposing party's response to those pleadings." Item 88, p. 10, citing *Chase Manhattan Bank, N.A. v. Drysdale*

*Sec. Corp.*, 587 F.Supp. 57, 59 (S.D.N.Y.1984). FDIC distinguished *Bowne* by comparing how the attorneys' roles had differed substantially from the case at bar: the *Bowne* attorneys not only provided legal advice but dealt directly with third parties. Those interactions, coupled with the fact that the attorneys took independent action and made relevant decisions affecting the claim, took on importance in the underlying suit and operated to waive the privilege. The court did not find the privilege waived simply because plaintiffs might be unfairly deprived of potentially crucial evidence impacting its case. In addition, FDIC cites *Paramount Communications, Inc. v. Donaghy,* 858 F.Supp. 391 (S.D.N.Y.1994), for the proposition that in order to come under the protection of privilege, "the attorney-client relationship [must be] relied upon, in some fashion, affirmatively to support the asserting party's claims, or their [sic] was evidence that the attorneys themselves independently took actions or made decisions relevant to the case ...." *Id.* at 397.

The "at-issue" waiver applies both to the attorney-client and work-product privileges. *Tribune* at *6. In analyzing the *Hearn* factors to determine whether the "at-issue" waiver applies to FDIC, certainly the first element (FDIC's filing suit) and the third element (denying MassMutual vital information for its defense) apply. The question is whether the second element, the asserting party [FDIC] put the protected information "at issue" by making it relevant to the case, applies.

It is clear that MassMutual, not FDIC, put the Singerman Memorandum "at issue" by asserting its affirmative defense. FDIC's pleading charges that RTC "reasonably and justifiably relied on the representations" of MassMutual in deciding whether to adopt an amendment to the Pension Plan; that the calculations were incorrect, resulting in the Plan's being underfunded. Item 1, ¶ 16. FDIC reiterates that it only put "at issue" the amount of damages incurred by its reliance on MassMutual's erroneous advice, not the total underfunding which it acknowledges is larger. Item 89, ¶ 7. Further, during oral argument, Mr. Goroff averred that FDIC would not rely upon the Singerman Memorandum to prove its case. MassMutual's affirmative defense of failure to mitigate damages (Item 6, ¶ 24) put the Memorandum "at issue" as it sought to show that the underfunding might have been eliminated or lessened had FDIC chosen other options proffered therein. FDIC's pleading did not require analysis of the possible legal options contained in the Memorandum to challenge MassMutual on a professional malpractice claim.

*Chase Manhattan Bank N.A.* is instructive on the "at-issue" waiver, particularly where the plaintiff pleads reliance on defendant's advice. Defendant sought access to communications from Chase's legal department concerning whether Chase was an agent or a principal in trading with another defendant. The answer would impact on the outstanding $287 million liability in the contested securities transactions. Chase's claim, however, was that it relied on defendant's allegedly fraudulent opinion of a failed securities firm, which resulted in an extensive loss. Citing *Hearn,* the court analyzed defendant's assertions of implied waiver:

> While it may be useful to [defendant] to know the substance of the advice Chase received concerning its liability on the transaction, I do not believe that the communications are essential to establish what a reasonably prudent bank should have known and should have done under the circumstances ....
>
> ... *It cannot be possible for [defendant] to justify breaching Chase's privilege by reason of its own pleading of an affirmative defense. That would give an adversary who is a skillful pleader the ability to render the privilege a nullity.*

*Id.* at 58–59 (emphasis added). *See Tribune Co. v. Purcigliotti,* 1997 WL 10924 at *7 (S.D.N.Y.1997) (although the non-privileged party is "free to attempt to demonstrate the converse conclusion ... they cannot justify breaching plaintiff's privileges based on defenses they chose to assert."). Further, "what was said between client and counsel may be useful for an adversary to know, but may not be particularly relevant, no less

essential, to proving or disproving a claim of fraud." *Id.* at *8.

Here, it is necessary to untangle plaintiff's claims and defendant's vigorous affirmative defense. Plaintiff filed suit contending that its reliance on *defendant's* representations caused the Plan's funding shortfall. This claim did not place the Singerman Memorandum at issue. Nor did plaintiff act affirmatively to make the Singerman Memorandum relevant to the case. Invasion of privilege is not required to determine the validity of FDIC's claim. The court thus finds that the "at-issue" waiver does not warrant production of the Singerman Memorandum based on the *Hearn* grounds.

**b. "At Issue" and the Fairness Doctrine**

Privilege may also be waived when invoked in some fundamentally unfair way. *Tribune* at *5. The "fairness doctrine" is another offshoot of the "at-issue" waiver doctrine. It was propounded in *Bilzerian* where the defendant, charged with securities fraud, pled a good faith defense based on his belief in the lawfulness of his transactions. At the same time, he asserted the attorney-client privilege in an effort to forbid cross-examination concerning his communications with his attorney on the matter. Nevertheless, the court found an implied waiver. The Second Circuit affirmed, citing *von Bulow,* that the privilege could not "at once be used as a shield and a sword," and that defendant impliedly waived the privilege when he asserted "a claim that *in fairness* requires examination of protected communications." 926 F.2d at 1292 (emphasis added). *See also In re Kidder Peabody Securities Litigation,* 168 F.R.D. 459, 470 (S.D.N.Y.1996).

Further, waiver may be found even if the privilege holder "does not attempt to make use of a privileged communication; he may waive the privilege if he makes factual assertions the truth of which can *only* be assessed by examination of the privileged communication." *Id.* (emphasis added). Even if the court found that FDIC made the kind of factual assertions in its claims that would waive privilege, it would still be possible to examine those assertions in depositions of RTC officers, plaintiff's expert, and interrogatories without requiring review of the privileged communications.

Again, however, in these circumstances, the *privilege holder* put the communications protected by the privilege at issue, as part of its defense, and then turned around and offensively asserted privilege to prevent the substance of the communications from being examined. Courts refuse to allow the privilege to stand in such circumstances because it is not fair to the adversary. This approach is consistent with the *Hearn* analysis, where the privilege holder takes an affirmative position that places at issue the very information sought to be protected. It does not apply, as MassMutual asserts, to *any* "claim that in fairness requires examination of a privileged communication, [there by waiving] both the attorney client and work product privileges." Item 92, p. 20, citing *Occidental Chemical,* 175 F.R.D. at 435–36. Thus, the fairness argument under the "at-issue" waiver is equally unavailing for MassMutual in its effort to gain access to the Singerman Memorandum.

**5. Waiver via Disclosure**

*Bowne* sets forth the differences in disclosure waiver between the attorney-client and work-product privileges.

> The standards for waiver of the attorney-client privilege and of work-product immunity differ to a degree, with greater protection afforded to work-product. The attorney-client privilege is waived if the "holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication." ... If [the privilege holder] undertakes actions that will predictably lead to the disclosure of the document, then waiver will follow....
>
> The protection of the work-product rule is less readily waived.... As articulated by most courts, such a waiver will be found only if the party has voluntarily disclosed the work-product in such a manner that it is likely to be revealed to his adversary.

150 F.R.D. at 478–79 (citations omitted).

Once again, issues of fairness permeate whether waiver by disclosure should

be found. The Second Circuit has "held that the scope of any waiver by virtue of disclosure [is] to be defined by the so-called 'fairness doctrine,' which 'aims to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information."' *Granite Partners,* 184 F.R.D. at 54 (citations omitted). By selective disclosure, the court was referring to a litigant's "releasing only those portions of the material that are favorable to his position, while withholding unfavorable portions." *Id.* This is another articulation of *von Bulow*'s admonition that waiver may be found when "the privilege-holder has attempted to use the privilege both as 'sword' and 'shield.'" *In re von Bulow,* 828 F.2d 94, 102 (2d Cir.1987). In other words, "a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party." *In re Grand Jury Proceedings,* 219 F.3d 175, 182 (2d Cir.2000). Courts have decided whether fairness considerations require disclosure on a case-by-case basis. *Id.*

It is important to keep in mind that waiver of one privilege will not necessarily mean waiver of the other. *See In re Pfohl Bros. Landfill Litigation,* 175 F.R.D. 13, 21 (W.D.N.Y.1997) ("[T]he two privileges must be separately asserted as they are grounded in different policies and waiver of the attorney-client privilege will not result in automatic disclosure of a communication that still enjoys work-product immunity."); *In re the Leslie Fay Companies, Inc., Securities Litigation,* 161 F.R.D. 274, 282 (S.D.N.Y.1995) ("Because assumedly many of the documents [do not qualify under the work product privilege], their discovery may be foreclosed under the attorney-client privilege.")

MassMutual argues that waiver through disclosure occurred in two ways: one, through voluntary statements allegedly made by Raymond Goetz, an associate at Hopkins & Sutter, to Bethany Alvord, Second Vice President and Assistant General Counsel of MassMutual, that "disclos[ed] the contents of the Singerman memorandum." Item 86, p. 21. MassMutual charges that Goetz "generally described the nature and contents of the memorandum, as well as specific legal advice contained therein." *Id.* The recounting of this conversation was contained in an Affidavit by Allan Johnson, Vice President and Actuary of MassMutual, who FDIC charged is the MassMutual representative who later informed them of the error in its calculations concerning the 1990 Amendment. Item 85, Exhibit F. MassMutual also asserts that FDIC waived its right to claim privilege concerning the Memorandum when the cover letter from Singerman to RTC was disclosed to them. MassMutual received the cover letter from the files of Buck Consultants in 1999 as part of the discovery process. Item 85, ¶ 26. Not only does the letter tend to confirm some of the statements made by Mr. Goetz in his conversation with Ms. Alvord, MassMutual argues, but because the cover letter was produced, disclosing advice to a third party, apparently Buck Consultants, "RTC and Hopkins & Sutter has [sic] waived any privilege that might have applied to the subject matter of that advice." *Id.*

FDIC responds that Goetz's statements are unreliable double hearsay, given that Johnson's affidavit relates the substance of the conversations between Alvord and Goetz and that Goetz's deposition testimony fails to support MassMutual's allegations. FDIC then explores the three statements Goetz was alleged to have made in an effort to show that no significant legal advice was revealed. In its papers, FDIC did not respond to MassMutual's claim that waiver was effected by voluntary disclosure of the cover letter to the Singerman Memorandum to Buck Consultants. However, at oral argument, FDIC addressed that issue, as well as MassMutual's inquiry whether persons at Buck Consultants saw the memorandum itself.

### a. Waiver Effected Through Goetz's Statements

MassMutual points to Mr. Johnson's affidavit (Item 85, Exh. F), where he recounts information related to him from Bethany Alvord about conversations Ms. Alvord had with Raymond Goetz concerning the funding of the Pension Plan. Mr. Johnson

reported that in an October 9, 1991 conversation, Mr. Goetz told Ms. Alvord that by " 'aggressively' reading the Pension Plan, he felt that there would be sufficient funds for all Plan participants" and that "there was no need to notify the Pension Benefit Guaranty Corporation (the PBGC) of any alleged underfunding." Item 85, Exh. F, ¶ 18. In another conversation with Ms. Alvord described in the Johnson Affidavit, Mr. Goetz "blamed the RTC for failing to take appropriate action with respect to the Pension Plan ...." *Id.* ¶ 20. Mr. Goetz described to Ms. Alvord

> a 50 page memorandum he had written which reviewed the entire status of the Pension Plan ..., proposed various options available to the RTC, extensively analyzed them, and advised the RTC which action to take. He again admitted that the terms and provisions of the Pension Plan could be read 'aggressively' so that there would be sufficient assets to cover the Pension Plan's liabilities.

*Id.* ¶ 21. Mr. Goetz additionally explained that the Memorandum included "specific advice to the RTC that it should 'sit tight' on a particular MassMutual investment ...." *Id.* ¶ 22. As a result, MassMutual claims that Goetz's description of the Memorandum communicated to Alvord served as a waiver of privilege. MassMutual provides no case law in support of its assertion.

FDIC responds that Goetz, in his deposition (Item 89, Exh. B), recalled that he told Ms. Alvord that "a law memorandum was being prepared discussing the underfunding and the legal issues surrounding the underfunding." *Id.* p. 135. He could not recall, saying that the Plan could be read aggressively so that it was not underfunded: "If anything, it would have been the opposite." *Id.* p. 137. Secondly, FDIC avers that Goetz's statements notifying Alvord about the existence of the Memorandum did not constitute a waiver of its contents; identifying one option did not constitute a waiver since it did not reveal the essence of the substance of the communication. In sum, Goetz's comments did not reveal the advice provided in the Memorandum and did not constitute disclosure.

The statements allegedly made by Goetz to Alvord, cited by Johnson in his Affidavit, are double hearsay. Under Fed.R.Evid. 104(a), the court is "not bound by the prohibitions contained in the Federal Rules of Evidence against the use of hearsay when making a determination regarding the existence and waiver of the work-product privilege." *Cooper Hospital/University Medical Center v. Sullivan,* 183 F.R.D. 119, 129 (D.N.J.1998). "When making a preliminary determination..., a judge may rely upon a hearsay statement, giving 'it appropriate weight based on his or her judgment and experience.' " *Id.* (citation omitted).

Given Mr. Goetz's direct denial in his deposition concerning the text of his conversation with Ms. Alvord, and the unreliability inherent in the double hearsay report of Alvord's conversation with Goetz contained in Johnson's Affidavit, the court concludes that Goetz's alleged statements do not provide a ground for waiver by disclosure.

**b. Waiver Effected Through Disclosure of the Cover Letter**

MassMutual notes that the August 30, 1991 cover letter was "produced from the files of Buck Consultants." Item 85, ¶ 26. The letter specifically discusses the contents of a memorandum, presumably the Singerman Memorandum. MassMutual reasons that "[b]y disclosing this advice to a third party, the RTC and Hopkins & Sutter has waived any privilege that might have applied to the subject matter of that advice." *Id.*

In the case at bar, Hopkins & Sutter did not undertake actions that would predictably lead to disclosure of the Memorandum. Singerman wrote a cover letter to RTC that described some aspects of the Memorandum. A copy of that cover letter surfaced eight years later in papers provided by Buck, the outside actuarial consultants hired by RTC. There is no evidence that FDIC affirmatively disclosed "a significant part" of the Memorandum text, or that FDIC attempted to selectively use the information in the cover letter to enhance its legal position vis-a-vis MassMutual. Providing the cover letter to its expert is not an example of "voluntarily disclosing the work-product in such a manner

that it is likely to be revealed to [its] adversary." *Bowne,* 150 F.R.D. at 479. The 2–page cover letter, while generally summarizing some of the items mentioned in the Memorandum, did not cite the arguments in detail so as to constitute waiver by disclosure of the 55–page document.

In addition, there is no evidence that persons at Buck Consultants received a copy of the Memorandum. The question of waiver arose at oral argument, where Ms. Fitzgerald claimed that if anyone at Buck had seen the Memorandum, FDIC's privilege would have been waived. Mr. Goroff agreed, and promised the court he would investigate the matter of disclosure and send affidavits on the issue. FDIC subsequently provided two affidavits, one from Robert Scharbach, Principal and Consulting Actuary with Buck (Item 99), and one from Frederic Singerman, Esq. (Item 98), the author of the Memorandum, concerning who had been privy to its text. Mr. Scharbach averred that he had "no recollection of ever seeing the Privileged Memorandum and do not believe I was shown the document. No copy of the Privileged Memorandum is in my files." Item 99, ¶ 3. In his affidavit, Mr. Singerman recited how he sent "a detailed privileged and confidential memorandum" to the two attorneys at RTC whose names appeared on the cover letter. He also sent carbon copies to "five other attorneys and client representatives working on the matter," three of whom were RTC attorneys and two of whom were Hopkins & Sutter attorneys. Item 98, ¶ 3. Mr. Singerman added that he had "no recollection of showing Mr. Scharbach the Privileged Memorandum which I intended for attorney use . . . ." *Id.*, ¶ 4.

The court therefore finds that the production of the cover letter did not waive FDIC's attorney-client or work-product privileges in the memorandum.

### 6. MassMutual's Claim That FDIC Changed Theories

MassMutual charges that FDIC attempted to avoid discovery by claiming it only sought the alleged cost of the 1990 amendment purportedly adopted on the advice of MassMutual. Item 85, ¶ 49. MassMutual notes that the damages figure cited by FDIC has changed from $2.2 million, as alleged in the complaint, to $4.5 million, contained in the expert report from Buck Consultants, and a presumably undefined figure under FDIC's theory that "but for MassMutual's advice, it would have considered whether to repudiate the Pension Plan." *Id.* ¶ 51. This "moving target of damages" makes it even more crucial that MassMutual obtain the discovery it seeks.

FDIC responds that its theory of damages has remained consistent. FDIC would not have passed the Amendment but for MassMutual's advice. MassMutual's calculations were in error, and the only damages sought are costs arising from the early retirement subsidy, which could otherwise have been avoided. The discrepancy in damage estimates arose because the earlier $2.2 million figure was based on an FDIC estimate of the Amendment's cost and the $4.5 million is based on Buck Consultant's independent calculation.

The court finds that FDIC did not change its theory of damages. The actual damage figure may be ascertained at trial. This argument proffered by MassMutual does not provide an additional reason to compel production of the Singerman Memorandum.

### 7. Relevancy

It is surprising that FDIC continues to argue that "all documents prepared or produced after September 27, 1990 are irrelevant to FDIC's claimed damages or to any legally valid defenses asserted by MassMutual," and on that basis should deny MassMutual's motion. Item 89, ¶ 14. In its orders dated November 9, 1999 (Item 80) and February 22, 2000 (Item 82), this court held that MassMutual could engage in broad discovery, including post-amendment documents and documents related to its affirmative defenses. Therefore, the court finds that the relevancy argument once again asserted by FDIC is unavailing.

## B. MassMutual's Second Motion to Compel Answers to Interrogatory 23 and Provide Related Documents

Interrogatory 23 of MassMutual's Second Set of Interrogatories, dated October 11, 1996 (Item 85, Exh. I) requests:

23. Identify all actions, courses of action, remedies or alternatives, if any, which the RTC, its agents, attorneys or representatives considered to correct all or part of the alleged underfunding of the Plan after such underfunding was determined as alleged in the Complaint, and with respect to each such action, course of action, remedy or alternative which was considered, identify:

(a) each action, course of action, remedy or alternative that was taken or rejected by the RTC;

(b) the reason why the RTC determined to take or reject the action, course of action, remedy or alternative; and

(c) if the action, course of action, remedy or alternative was taken, whether it corrected some or all of the alleged underfunding of the Plan.

Upon receiving an incomplete response to this interrogatory and related Notices to Produce, MassMutual moved to compel. In an order dated November 9, 1999, the court ordered FDIC to answer the interrogatory fully and in good faith. Item 80, p. 24. In its amended response, FDIC replied:

FDIC objects to Interrogatory No. 23 to the extent it calls for information protected by the work product and attorney-client privileges. Subject to and without waiving its objections, FDIC states that an actuarial consulting firm, Buck Consultants, advised FDIC on various courses of action, remedies, and alternatives relating to the underfunding. The substance of these consultations is disclosed in documents already produced to MassMutual, including the following: a) letter dated July 9, 1991, from Scharbach to Singerman; b) letter dated July 18, 1991 from Scharbach to Singerman; c) letter dated August 13, 1991 from Rinaldi to Singerman; d) letter dated August 15, 1991 from Scharbach to Singerman; e) letter dated November 7, 1991 from Scharbach to Maliniak; and f) letter dated November 18, 1991 from Scharbalch [sic] to Maliniak. Based on the advice of counsel, FDIC did not implement the courses of action, remedies, and alternatives discussed in these documents. FDIC is unable to answer this interrogatory further without disclosing privileged information.

Item 85, Exh. H, pp. 9–10.

FDIC asserts that it has "produced to MassMutual all non-privileged information responsive to MassMutual's discovery requests that is in FDIC's possession, custody, or control;" that it made available for deposition all of the FDIC decisionmakers and FDIC attorneys who provided legal advice in connection with winding down of the Plan. Item 88, pp. 16–17.

MassMutual continues to object to FDIC's answer to Interrogatory 23, stating that it asked specifically for "the reasons why alternatives were accepted or rejected" and pointed out that FDIC identified no FDIC official(s) who may have considered underfunding options and how to interpret the Pension Plan. Item 85, ¶ 38. Further, MassMutual, by its current motion to compel, seeks all documents providing advice to RTC, and all documents related to RTC's decision-making in 1991 and 1992 concerning interpretation of the Pension Plan and how to address its funding status. These requests can be found, *inter alia*, in items numbered 5 (Notice to Produce dated Feb. 13, 1995) and 2, 3, 4, 6, 10, 20, and 21 (Notice to Produce dated Oct. 11, 1996).

The court agrees with MassMutual that the interrogatory asks for the reasons certain alternatives were accepted or rejected by FDIC, not simply the reason why it did not pursue other courses of action. The court also finds it curious that FDIC cites and provides no internal documents that reflect its decision-making process, based on advice from internal or external sources, other than Buck Consultants and Hopkins & Sutter, the latter of which it claims fall under the umbrella of privilege. During oral argument, MassMutual's counsel, Mary Fitzgerald, related to the court that when she examined the boxes of documents produced in discovery, she could find nothing reflecting RTC's decision-making process concerning why it chose to interpret the Plan as it did and/or discussion of other available options. As MassMutual points out, FDIC has produced information that *leads up* to the decision, as well as information concerning the

actions taken *after* the decision was made, but provides nothing on the decision process itself, which is relevant to MassMutual's affirmative defenses.

Clearly, both Buck Consultants and Hopkins & Sutter were providing advice to FDIC concerning possible alternatives to the underfunding issue. Although the court has ruled that the Singerman Memorandum does not have to be produced, it strains credulity that FDIC authored no internal documents that discussed the underfunding and the best option in dealing with it. This absence of documentation is particularly significant, since Hopkins & Sutter continues to assert that it provided legal advice, but FDIC made the final business decision on how to wind up the plan. Documents in this category would represent unprivileged business decisions that FDIC personnel assessed and made. Assertion of privilege cannot be used to evade discovery in such a circumstance, because such communications would not involve attorney-client privilege, since they would not be communications between the attorney and client. Nor would they involve the workproduct privilege.

However, counsel for FDIC asserted unequivocally that no other documents, including Case Memoranda, exist. In spite of that assertion, the court orders FDIC to further search through its documents to ascertain that no such documents exist in answer to Interrogatory 23. A further affidavit shall be filed setting forth by whom and how the search was conducted and the result of the search. This further affidavit shall be filed not later than 30 days after the filing of this order. The court will delay ruling on this part of the motion until after the affidavit is filed. If FDIC continues to cite privilege in response to Interrogatory 23 and the accompanying Notices to Produce, the court directs FDIC to submit those documents under seal in order that the court may determine whether they are protected by privilege.

## II. FDIC's Cross–Motion to Compel

FDIC charges that MassMutual has failed to comply with its discovery obligations by failing to (1) comply with its expert disclosure obligations; (2) produce relevant documents; and (3) produce a designated Rule 30(b)(6) witness. Item 87, ¶ 4,

### A. Failure to Make Expert Disclosures

FDIC recites that in June 1997, it identified its expert witness, Robert Scharbach of Buck Consultants. In December 1997, it made available all documents reviewed by the witness that were in possession of Hopkins & Sutter; and in 1999, FDIC produced all documents in the possession of Buck Consultants as well as Mr. Scharbach's expert report. Item 87, ¶ 4. FDIC protests that although it has asked MassMutual to disclose the identity of its expert witness, MassMutual has not done so. FDIC notes that in an Order dated August 30, 1999 (Item 75), the "court ordered that by November 1, 1999, the parties should be ready to identify their expert witnesses." Item 87, ¶ 5. FDIC seeks an order requiring MassMutual to make its expert disclosures forthwith.

MassMutual responds that much of the delay has resulted from FDIC's own actions, and asserts that the outcome of its current motion to compel would affect the scope of Mr. Scharbach's deposition. Further, MassMutual asserts that its ability to select an expert and provide an expert report has been "hampered by the fact that the FDIC has not completed its disclosure obligations to MassMutual," particularly with reference to the Singerman Memorandum. Item 92, p. 29.

Given that the Singerman Memorandum does not have to be produced but other documents may be, the court delays ruling on this part of FDIC's motion to compel. However, when the court rules upon the Interrogatory No. 23 motion, MassMutual should be ready to name an expert with dispatch.

### B. Failure to Produce Documents

#### 1. Computer error

FDIC next cites MassMutual for failing to produce "any documents relating to its computations of the costs associated with the [1990] amendment including, most importantly, the computational error described in Allan Johnson's May 15, 1991 letter." Item 89, Exh. E. "Despite the central importance of this computer error in this case," FDIC

charges, "MassMutual has not produced a single document related to this computer error, despite repeated requests by FDIC." Item 87, ¶ 7.

MassMutual responds that in 1996, it produced computer records underlying Allan Johnson's Sept. 24, 1990 and May 15, 1991 letters, as well as the Schedule EAS. Item 92, p. 30; Item 91, Exh. F. Noting that FDIC has not identified any other computer records underlying other calculations that it seeks to obtain from MassMutual, MassMutual's position is that it "has responded to the FDIC's request for the computer records underlying its calculations." Item 92, p. 31.

During oral argument, it was clarified that although counsel for MassMutual sent the requested computer runs to FDIC's counsel, Mr. Goroff never received them. Ms. Fitzgerald stated she would re-send them.

Also during oral argument, counsel for MassMutual asserted that there were no additional documents concerning MassMutual's use of the faulty computer program (i.e., correspondence, notes, purchase order). The court finds this dearth of documents as curious as it found the lack of documents regarding RTC's decision-making process regarding Plan underfunding. The court directs MassMutual to search once again to ascertain that no such computer documents exist and to file an affidavit under the same conditions as the one to be filed by the FDIC.

### 2. Post–Amendment Documents and Documents Related to Affirmative Defenses

FDIC has requested all documents related to MassMutual's "post-Amendment activity" and affirmative defenses. MassMutual avers it has produced all non-privileged responsive documents and that "there are no documents regarding its affirmative defenses that MassMutual is withholding." Item 92, p. 32.

At oral argument, counsel for MassMutual asserted they have provided all non-privileged post-Amendment documents and claimed that no documents related to affirmative defenses exist. Accepting those responses on good faith, the court denies FDIC's cross-motion to produce these documents.

## C. Failure to Produce a Rule 30(b)(6) Representative

FDIC states that it served a notice of deposition pursuant to Fed.R.Civ.P. 30(b)(6) in May 2000 "command[ing] the testimony of the MassMutual designee most knowledgeable about MassMutual's affirmative defenses to the Complaint." Item 87, ¶ 10. MassMutual responded that it could not produce a representative on the date noticed but would provide alternative dates. However, MassMutual has not done so, despite FDIC's repeated requests.

MassMutual answers that it advised FDIC that it would not be able to produce a witness on the June date selected by FDIC. Further, given that the only other dates FDIC provided were also in June, these alternatives provided MassMutual little time to arrange a deposition. However, MassMutual avers it "never told the FDIC ... that it would not produce a witness pursuant to F.R.C.P. 30(b)(6) ... [and] remains willing to produce [one] at a mutually convenient date or time." Item 91, ¶ 39.

Counsel for MassMutual informed the court that the deposition of the 30(b)(6) witness was scheduled for February 2001 in Chicago. MassMutual will also supply the court with the witness's name. Given MassMutual's willingness to produce a 30(b)(6) witness, the court denies FDIC's motion to compel. If the deposition has not been held to date, the court shall be notified so that an appropriate order may be filed.

## D. Attorney's Fees and Costs

Lastly, citing MassMutual's delays in complying with discovery, FDIC seeks expenses, including attorney's fees, incurred in preparing its motion to compel.

Rule 37(b)(2) provides that where a party fails to obey an order to provide discovery,

> the court shall require the party failing to obey the order or the attorney advising the party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that

the failure was substantially justified or that other circumstances make an award of expenses unjust.

Because the court has not found that MassMutual failed to obey an order requiring discovery and has not otherwise been dilatory, it denies FDIC's motion for reasonable expenses.

## *CONCLUSION*

The court finds that both attorney-client and work-product privilege has not been waived and continues to protect the Singerman Memorandum from discovery. Defendant's Motion to Compel answers to Interrogatory 23, and plaintiff's Cross–Motion to Compel expert disclosures and to produce documents concerning the computer error, will be decided after the ordered affidavits are filed. Plaintiff's Cross–Motion to Compel post-amendment documents, documents related to affirmative defenses, and production of a Rule 30(b)(6) representative is denied. Plaintiff's Cross–Motion for attorney's fees is also denied.

So ordered.